NEILSON *against* M'DONALD and others.

It *seems*, that a party charged as combining with others, in a fraud against which relief is sought, and, therefore, made a defendant, but no particular relief prayed against him, may be a witness for his co-defendants, though liable for costs.

Where the plaintiff, whose personal property had been seized under an execution against him for about 500 dollars, and a sale of it forced, with great rigor and oppression, and at enormous sacrifice, by the deputy Sheriff, acting in concert with the creditor, who was the chief bidder at the sale, was induced, in order to avoid the sacrifice of the whole property, to yield to the demands of the creditor, and to give him a bond and mortgage for 2,500 dollars, so as to cover, not only the amount of the execution, but also debts due from a son of the plaintiff, who was insolvent; the sale was declared oppressive and illegal; and the bond and mortgage, as having been unduly and fraudulently obtained, were directed to stand as security only for the amount due on the execution, with interest and costs, and on payment of that amount, to be delivered up and cancelled.

THE bill, filed *January* 25, 1821, stated, that in *November*, 1820, the defendants, *M'Donald* and *Franklin Livingston*, caused a *fi. fa.* to be issued on a judgment obtained by them against the plaintiff, in *August*, 1819, for 483 dollars and 62 cents, which was delivered to the defendant, *W. Griffith*, as deputy of the Sheriff of the county of *Saratoga*, while the plaintiff was absent at the city of *New-York*. That *Griffith*, by virtue of the execution, seized all the plaintiff's personal property, consisting of horses, cattle, sheep, grain, &c. farming utensils, household furniture, &c. of the value of 3000 dollars, which were advertised for sale, at the plaintiff's dwelling house, on the 22d of *November*. The plaintiff returned home the preceding evening. About 9 o'clock, on the morning of the 22d of *November*, all the defend-

*July* 29th.

ants came to the plaintiff's house, when G., the deputy Sheriff, said that he had come to force a sale of the plain-tiff's property. The plaintiff requested G. to delay the sale for three hours, so that he might send to the distance of four miles, to get the money to satisfy the execution; and G. answered, that the payment must be in *specie.* The plaintiff then requested indulgence until the next morning, that he might procure specie, and offered G. any security he might wish; G. answered, that he should be governed by the plaintiffs in the execution. G. refused to grant any delay, and proceeded immediately to sell the property, the greater part of which was struck off to the defendants, *M'Donald*, *Livingston*, and *Eddy*, as the highest bidders. The amount of sales was 298 dollars, and 65 cents, though the real value of the property sold was about two thousand dollars; and the sales were made with such unusual rapidity, as scarcely to allow time for a second bid. After the stock, farming utensils, grain, &c. were sold, G. said he should proceed to sell the household furniture to satisfy the residue of the execution. The bill stated, that the plaintiff, being greatly agitated at the vio-lent and oppressive proceedings of the defendants, and moved by the anxiety of his wife and family, to prevent a sacrifice of his household furniture, and being ignorant whether he could obtain redress against such proceedings, with the advice of an attorney, who had arrived in the mean time, entered into a negotiation with the defendants, *M'D.* and *L.* That *M'D.* had, in *May Term,* 1817, recovered a judgment against one of the plaintiff's sons, for about 1,600 dollars, and on which the Sheriff, in *July,* 1818, took and sold goods, to the value of 400 dollars, which the plaintiff had previously purchased under a prior judgment and execution against his son. The defendant, *M'D.,* demanded 2,500 dollars, for the judgment against the plaintiff and the judgment against his son, and for a promissory note of the latter, for 800 dollars, indorsed by

J. *Boyce;* and that the plaintiff should, also, assume to pay a note of his son, held by the defendant, *Eddy,* for about fifty dollars. That the judgment against the plaintiff's son, and the notes, were not recoverable, as the plaintiff's son and *Boyce* were utterly insolvent. The plaintiff, induced by the reasons mentioned, and apprehending that his real estate might also be sacrificed, complied with the demand of *M'D.* and *L.,* and executed to *M'D.* a mortgage in fee of 98 acres of land, and a bond for 2,500 dollars, with interest; and gave his note to the defendant, *E.,* for 50 dollars; and, thereupon, the property sold was given up, and *M'D.* assigned to the plaintiff the judgment and note against his son, and the judgment against the plaintiff himself was discharged. The plaintiff, afterwards, tendered to the defendants, *M'D.* and *L.,* the amount of the execution against himself, and demanded the bond and mortgage, which they refused. The bill charged a fraudulent combination between the defendants, to oppress the plaintiff, and to coerce him to assume the debts of his son, &c. That *M'D.* had brought a suit against the plaintiff, on the bond, &c. *Prayer,* for an injunction, &c. and for general relief.

The defendants answered separately, and denied any fraudulent combination, &c. The defendant, *M'D.,* in his answer, admitted, that the property sold was worth about 1,200 dollars; that the amount of sales was about 300 dollars; that all the purchasers, except him and *L.,* were required immediately to pay in specie. That the property was restored, afterwards, on the plaintiff's agreeing to the demands of the defendant, and giving the bond and mortgage as stated in the bill, and the judgment and note of *J. Neilson,* jr., were assigned to the plaintiff, and the judgment against the plaintiff discharged. He admitted, that he required the payment in specie, with a view of preventing the plaintiff from obtaining the means of paying the execution, and of making advantageous purchases at the

1822.

NEILSON
v.
M'DONALD.

sale, so as to secure a portion of his large demand against *J. Neilson*, jr., the plaintiff's son. That he had sued the plaintiff on the bond, who had made a tender of the balance due on the execution, with the costs and fees, and demanded the bond and mortgage, which the defendants had refused.

Proofs were taken in the cause; and the defendants, *Griffiths* and *Livingston*, were examined as witnesses for the other defendants, and their depositions taken *de bene esse*.

*A. Van Vechten*, for the plaintiff.

*B. F. Butler*, for the defendants.

*Whether a party charged with combining with others, in a fraud, against which relief is sought, and he, therefore, is made a party, but no particular relief prayed for against him, may be a witness for his co-defendants, though liable for costs.*

THE CHANCELLOR. Before I enter on the discussion of the merits of this case, I must dispose of a preliminary question, respecting the competency of the testimony of the defendants, *G*. and *L*., who were examined as witnesses for their co-defendants, saving all just exceptions.

1. Those defendants are charged as parties to a fraudulent combination to oppress the plaintiff; and by means of which the bond and mortgage, in question, were extorted from him. The testimony in the case fully supports the charge; but still those two defendants do not appear to have any further interest in the event of the suit, than what relates to the costs; and such an interest, Lord *Hardwicke* has more than once declared (*Barret* v. *Gore*, 3 *Atk.* 401. *Downing* v. *Townsend*, *Amb.* 592.) to be a sufficient objection to the competency of the testimony of a co-defendant, if the character of a *particeps criminis*, in respect to the charge of fraud, be sufficiently proved. But in *Cotton* v. *Luttrell*, (1 *Atk.* 451. 2 *Vesey*, 223. 284. S. C.) Lord *H*. seemed to entertain a different opinion, and to think that a cause could not be brought to a hearing against a person, against whom nothing is

prayed for, merely to charge him with costs. There is some difficulty in ascertaining the precise *English* rule on this point; and I should rather be inclined to think that rule to be, that a party to a fraud, against which relief is sought, and who, as one of a fraudulent combination, is properly made a party, though no particular relief is prayed against him, is, and may be, so far liable for costs, as to be rendered incompetent as a witness. If a party be liable for costs, *that* is an interest which disqualifies him at law, and in this Court; and every party to a fraud is liable, as a *particeps criminis*, to respond for the entire costs, if he alone should be able to pay them. However, as the authorities on this point are loosely stated, and seem to be contradictory; and, as one of the judges of the Supreme Court, as well as myself, entertained and expressed an opinion, in the Court of Errors, (*Beebee* v. *Bank of New-York*, 1 *Johns. Rep.* 556. 577.) favourable to the competency of a defendant as a witness, who was no otherwise affected in interest by the object of the suit, than as respects the costs, I shall admit the depositions of the defendants, *G.* and *L.*, though the circumstances under which they are placed in the cause, must necessarily impair, in a degree, the credibility of their testimony.

2. In the examination of the merits, the testimony of the two defendants does not appear materially to alter or affect the conclusions which follow, necessarily, from a review of the pleadings and proofs.

The sale complained of was very evidently held and conducted by concert among all the defendants; and the object of the combination was to enable the defendants, *M'D.* and *E.*, to buy in the property of the plaintiff, at an enormous sacrifice of it, in order to indemnify themselves for the hazard or the loss of their debts against an insolvent son of the plaintiff, or else to coerce the plaintiff, by these means, to assume those debts of his son. Either motive was unconscientious, and one which the law will not recog-

1822.

NEILSON
v.
M'DONALD.

nize and sanction. The defendants disclaim any such combination; but the facts admitted and proved, do, in my judgment, discredit their denial. The defendant, *M'D.*, who was the chief author of the transaction, and the most deeply interested in the success of the plot, admits in his answer, that " he did require payment in specie, at the sale, with the view of making advantageous purchases of property, at the sale, in the hope of thereby saving a portion of the large amount justly due him from the son of the plaintiff." The defendant, *G.*, who was bound to have exercised a sound discretion, according to his own judgment, in the time, mode, and terms of sale, admits, that when the plaintiff asked for a postponement of the sale, he replied, " that he should follow the directions of *M'D.*, the plaintiff, in the execution, and proceed to sell;" and " that before the sale commenced, *W. M'D.* informed him that he would require payment from him in specie, and that *G.* then declared that he should sell the property for ready pay in specie." The defendant, *L.*, who disclaims in his answer of having an interest in the execution under which the sale was made, and all concert and combination in the sale, admits that he purchased a number of articles, such as three pleasure sleighs, a riding chair, a wagon and harness, and a quantity of corn and hay, for very small prices, which he states, to the extent of 25 dollars; and that all the purchasers, except *M'D.* and him, had been required to make payment in specie, and that upon the settlement between the plaintiff and *M'D.*, he consented to give up what he purchased; and yet he says there was no combination! So the defendant, *E.*, admits in his answer, that he attended the sale, " in the hope of making advantageous purchases thereat, and of thereby saving his demand against the son of the plaintiff, or some portion thereof." It is in proof that the defendant, *E.*, came to the sale, prepared with specie in his pocket; and he gave up his purchases after

the plaintiff had assumed his son's debt to him; and yet he also denies all concert and combination!

The deputy Sheriff, G., plainly lent himself to be the agent of M'D., in this scene of oppression, and he is justly censurable for the abuse of his discretion, as a public officer, and by an unwarrantable use of his process, for the purpose of giving effect to this unlawful combination. The case, under all its circumstances, strikes me as a grievous instance of the abuse of power, for the purpose of oppression and extortion.

To give a just view of the case, it will only be necessary to state a few of the prominent facts.

The plaintiff was a man of large real and personal estate, to the amount of from ten to seventeen thousand dollars, according to different estimates. This fact was of public notoriety, and well known to the defendants. The forced sale, and the refusal of delay, and the demand of specie, were unmitigated acts of severity, for the sole purpose of extortion. The execution was for 480 dollars and 83 cents, and was levied while the plaintiff was absent at New-York, and the day of sale was fixed at the early day of the 22d of November, which was some weeks before the return day of the execution. The defendant, G., told a witness, (John Hunter,) that his object was to seize and sell the property of the plaintiff as soon as the law would permit, and he showed the execution to the witness, and mentioned that the plaintiff was absent at New-York, and that he was afraid he would be home before the sale, and get an order to stay it. This witness was a deputy Sheriff, and said that the conversation took place on the day of levying the execution. The defendant, G., whose deposition has been admitted, for the reasons already stated, admits he had a conversation with Hunter, relative to the execution and his proceeding on it, and undertakes to give, "as near as he can recollect," the conversation. He admitted he told the witness, that when the plaintiff

directed him to close the execution immediately, he always did it ; and that, " according to the best of his recollection," he did not make the observation charged upon him.   This defendant *G.*, is not an unexceptionable witness, consider- ing the charges against him which have been made in the bill, and proved, and considering that he was testifying un- der the influence which his character, as a defendant, and his hazard of responsibility for costs in that character, would naturally promote.   I have no doubt he used substantially the language imputed to him, and which marked the design of the combination.   So, also, on the evening of the day of the sale, all the defendants, and principally *M'D.* and *G.*, were engaged in conversation on the events of the day, and they said, in effect, that they had brought matters to bear just as they wished, and had bought in the outdoor personal property of the plaintiff for about 200  dollars, and brought him to a compromise for the debt due from his son.

At the sale, the defendant, *G.*, resisted all reasonable offers for delay ; and he admits that, before the sale, the plaintiff requested a postponement, and he said he should follow the directions of *M'D.*   A son of the plaintiff (*John Neilson*, jr.) says, that before the sale commenced, *G.* said he had come to make a forced sale of the property of the plaintiff, and that he must have the money immediately, and in specie, and he resisted the offers of the plaintiff of giving any security for a delay of a few hours, or until the next day.   The defendant, *G.*, in his answer, denies the fact of this previous conversation ; yet his conduct and declarations, during the whole course of the day, were pre- cisely of the same character.   A neighbour of the plain- tiff, (*John Walker*,) of property and credit, and known as such to the defendant *M'D.*, purchased, for 61 dollars, some articles worth 140 dollars, and he offered to pay in current bills immediately, or in specie, the next day, and both offers were rejected by the defendant, *G.*, at the instance

of the defendant, *M'D.* ; and the same articles were immediately put up again, and bid off by the defendant, *M'D.*, for 30 dollars. The defendant *M'D.* then told the witness, he did not dispute his word or credit, but he had then got the business so fixed, that it would not do to take any man's word, for he could then get his money, and he would have it. Another witness, (*Jacob Sanford*,) heard the plaintiff offer the defendant *G.*, that if he would wait until the next day, he would pay him in specie, and give him satisfactory security for the payment. Another witness, (*R. M. Livingston*,) remonstrated with the defendant, *G.*, against the proceedings at the sale, as oppressive and unjust, and contrary to his duty, and he repeated to the defendant *G.*, the offers of the plaintiff to procure the money in one hour, or if specie was required, to procure it as soon as possible from *Waterford*, and to give any security for the fulfilment of the offer. The defendants wholly disregarded the offer, and the defendant *G.* declared the determination not to stay the sale on any security, or on any account, unless the execution was immediately paid in specie. In the evening, after the sale, either the defendant *G.*, or *M'D.*, in the presence of the other, said, in the hearing of the witness, (*Walter Broughton*,) that the plaintiff wished to stop the sale, to get an opportunity to procure the money, but that *M'D.* had directed the sale to proceed, declaring, " he must be a *Turk* that day."

Property, to the value of 1800 dollars, or 2000 dollars, was sold for less than 300 dollars ; and about 3 o'clock in the afternoon, when all the out-door property of the plaintiff had been swept off, and the defendant, *G.*, with his coadjutors, was about to proceed to sell the furniture within the house, the friends of the plaintiff, to save his family from distress, and him from ruin, pressed him loudly to come to terms of accommodation. He did so ; and the defendant, *M'D.*, extorted a bond and mortgage from him, for 2500 dollars, covering not only the amount of the exe-

1822.

NEILSON
v.
M'DONALD.

1822.

NEILSON
v.
MᶜDONALD.

cution, but nearly 2000 dollars for demands, which the defendant, Mᶜ.D., had against a son of the plaintiff.

A decisive proof of the concert with which the three defendants, Mᶜ.D., L., and E., acted at the sale, and of the unjust and oppressive design with which they were actuated, is derived from the fact, that upon the settlement, all those defendants readily surrendered up the property which they had purchased.

It is perfectly apparent, that this settlement, and the giving of the bond and mortgage, and note, was not a free and voluntary act of the plaintiff; but that he was coerced into it by the distress under which he laboured, from the severe conduct of the officer, and the ruin that was overwhelming him. There was no time given for the parties to cool and reflect, nor for the mind of the plaintiff to be relieved from the terror of the proceeding. The settlement was made, *dum fervet opus;* and to talk of a bond and mortgage being *freely* given, while the victim lay bleeding at the spoiler's feet, is absurd. Such abuse of process is not to be tolerated. It would bring disgrace upon the administration of justice. Nothing can be more injurious to public morals, or excite greater alarm in the minds of the people, than to suffer the process of law to be made the instrument of extortion. It cannot ¹.e doubted, that this Court ought to afford ample redress in such a case; and the relief sought is conformable to the established principles of equity, and within the undoubted and indispensable jurisdiction of the Court.

In *Proof* v. *Hines,* (*Cases temp. Talbot,* 111.) a bond was obtained, not purely voluntarily, but under necessity. Advantage was taken of the party's circumstances and distress, and the Chancellor ordered the bond to stand as a security only for what was truly due at the time. So, in *Gould* v. *Okeden,* (3 *Bro. P. C.* 560.) a conveyance obtained by taking an unreasonable advantage of the party's distress, ignorance and dependance, was ordered to stand as a

security only for what was *bona fide* due. The same doc-
trine was declared in *Kenrick* v. *Hudson*, (6 *Bro. P. C.*
614.) and in *Thornhill* v. *Evans*, (2 *Atk.* 330.) In the
latter case, Lord *Hardwicke* set aside a deed obtained by
fraud and imposition, and declared, that where there was
an act of extortion, the Court would decree the party to
refund. The opinion of the Chancellor, in *Nicholls* v. *Ni-
cholls*, (1 *Atk.* 409.) is much in point. He said, that
though a man be arrested by due process of law, yet if a
wrong use be made of the arrest, by obliging him to exe-
cute a conveyance, which was never under consideration
before, the Court would construe it a duress, and relieve
him.

The cases which have been mentioned, are only fami-
liar illustrations of the ordinary doctrine and practice of
the Court.

The conduct of the plaintiff, in reference to other and
prior transactions, has nothing to do with this act, and
forms no justification or excuse for it. The execution it-
self, which was so misapplied, was the result of a reple-
vin suit, mentioned in the proofs, and embraced all the
claims of the defendant, *M'D.*, in relation to it. If
the plaintiff was accountable to that defendant, for the pro-
ceeds of the timber, of which so much has been said in
the case, the defendant, *M'D.*, had his remedy by suit, in
the regular course of justice. It is altogether inadmissi-
ble, to receive any counter claim or demand, by way of
set-off, against the right of the plaintiff, resting in tort,
and founded on the illegal combination, the abuse of
process, and the oppression of which he has been made the
victim. The plaintiff was not liable for the debts of his
son ; and the pretence, that the plaintiff voluntarily under-
took to discharge those debts, with the anticipated portion
of his son's share, in expectancy of the paternal estate, is
a very lame pretext for the extortion, and is no alleviation
of the proceeding. There is no rule of law, founded on

sounder principles of policy, or more conducive to the safety of private right, than that which forbids one tort or injury to be set off by way of compensation for another. It would be allowing parties to avenge, with their own hands, their own injuries, and would, in its consequences, recall the tumult and violence of the barbarous ages. In the case of spoliation, under the *Roman* law, no compensation was allowed to be opposed against the demand for restitution, according to the maxim of the civil and which is that of the common law ; *Spoliatus ante omnia restituendus.* (*Pothier Trait. des Ob.* s. 589. 2 *Inst.* 714.)

It is admitted, that the plaintiff has made a tender of the debt and costs, due on the execution, and offered to deliver up the assignment of the judgment, and the note to the defendant, *M'D.*, and has demanded a return of his bond and mortgage.

The following decree was entered:—

" It is declared and adjudged, that the sale of the personal estate of the plaintiff, on the 22d day of *November,* 1819, as in the pleadings and proofs is mentioned, was held and conducted oppressively, and contrary to duty, by the defendant, *G.,* and by combination between all the defendants, for the purpose of enabling some of them to make unlawful and unjust gains out of the plaintiff's property. And it is further declared and adjudged, that the bond and mortgage, given by the plaintiff on the same day, and in the pleadings mentioned, were fraudulently and unjustly extorted from the plaintiff, without any adequate consideration, by means of the said combination, and the terror and tyranny of the sale, and by the advice of his" friends, in order to stay the further and total sacrifice of his property. It is thereupon *ordered,* &c. that the bond and mortgage aforesaid, stand as a security only for the amount due on the execution against the plaintiff, at the time of the sale aforesaid, being 483

dollars, 63 cents, together with the Sheriff's poundage and interest on the whole, to the time of the tender thereof, charged and admitted in the pleadings; and that the plaintiff thereupon, within thirty days, pay the same (after deducting therefrom his taxable costs of this suit) to the solicitor for the defendant, *M'D.*, or deposit the same with the Register, for his use; and that he also, at the same time, reassign and deliver to the solicitor for the defendant, *M'D.*, or deposit with the Register, for his use, the note from *John Neilson*, jr., indorsed by *Jacob Boyce*, and that he reassign the judgment against *John Neilson*, jr., and which note and judgment are mentioned in the pleadings and proofs, as having been assigned by the defendant, *M'D.*, to the plaintiff, on the 22d day of *November*, 1819, and that he deliver or deposit such reassignment, as aforesaid. And it is further *ordered*, &c. that the defendant, *M'D.*, upon such reassignment and delivery, and upon payment or deposit of the said moneys, as aforesaid, after the deduction as aforesaid, and upon notice thereof, and of this decree, deliver up to the Solicitor of the plaintiff, or deposit with the Register, for his use, the bond and mortgage aforesaid, to be cancelled; and that he, at the same time, duly acknowledge satisfaction thereof, and cause such acknowledgment of satisfaction to be delivered or deposited with the mortgage. And it is further *ordered*, &c. that the defendant, *E.*, within thirty days after notice of this decree, deliver up to the plaintiff, or to his Solicitor, or deposit with the Register, for his use, to be cancelled, the note given by the plaintiff to him, on the 22d day of *November*, 1819, for 50 dollars, or thereabouts, and in the pleadings mentioned. And it is further *ordered*, &c. that the plaintiff recover, as against all the defendants, his costs of this suit, to be taxed, and to be deducted from the moneys to be paid to and for the use of the defendant, *M'D.* as aforesaid."